## LITTLE v. STATE.

### Opinion delivered November 26, 1923.

CRIMINAL LAW—NEW TRIAL—RECANTATION OF TESTIMONY.—In a prosecution for aggravated assault committed on a baby, in which there was testimony, aside from that of the child's mother, sufficient to sustain conviction, and in which it appeared, on defendant's motion for new trial, based on the mother's affidavit recanting her testimony that defendant had beaten the child, that the mother, since the trial, had come under the defendant's influence, a denial of the motion for new trial was not error.

Appeal from Crawford Circuit Court; *James Cochran,* Judge; affirmed.

*Webb Covington, John H. Holland, Chester Holland* and *John D. Arbuckle,* for appellant.

*J. S. Utley,* Attorney General, *John L. Carter, Wm. T. Hammock* and *Darden Moose,* Assistants, for appellee.

SMITH, J. Appellant was convicted of aggravated assault, alleged to have been committed by striking and beating an eleven-months-old child with a large comb.

Cecil McAfee, the mother of the child, testified that she lived with her child at appellant's home, and was employed by him as cook, and that one Sunday morning the child, at the breakfast table, turned over a cup of coffee, which burned appellant on the arm as it spilled out of the cup, and that in his anger appellant picked up the comb and struck the child over the shoulder, hip and leg and on the side of its face, and that the prints of the teeth of the comb were plainly visible, and these

places later turned black, and appellant said he whipped the child to break it from being stubborn. After breakfast appellant went to Fort Smith to deliver milk, as was his custom, and about an hour and a half later the witness, on the advice of the neighbors, followed with the baby, and the baby was carried to the office of the public welfare commission, where the nurse in charge saw it, and called the doctor, who examined the baby that morning and prescribed for it, and he came again to see it that evening. She took the baby away at noon the following day. Appellant learned where the witness was, and came to the office of the welfare commission, and offered to employ a doctor, and offered witness two hundred dollars not to testify against him. Witness told appellant a doctor had seen the baby, but appellant proposed to employ another physician if witness desired this, and appellant told witness to bring the baby and come back to his house. Appellant had always previously been good to her, and to the baby also.

The nurse testified that the child was bruised, and there were discolorations which looked like the child had been struck with something like a comb. The child had from one and a half to four degrees of fever, and was breathing hard and rapidly, and she called the doctor. Appellant came to the welfare building to see the child, and asked what was the matter with it, and offered to get another doctor if one was needed.

Doctor Parks was the physician who visited the child, and he testified that he found it suffering from external injuries about the chest, face and hips, and the child looked as if it had been struck with something, witness would not say with a comb, but the injuries could have been inflicted with a comb. He also stated that the injuries to the child might have been caused by its being carried by a drunken man on a mule, and by the face, chest and hips of the child coming in contact with the short stubby hair of the mule. It was the theory of the defense that the child had been injured by

being carried by Jim Thompson on a mule while Thompson was drunk.

Appellant denied that the baby had spilled coffee on him, and denied that he had ever struck the baby or had been angry with it. He testified that the baby's mother and Jim Thompson took one of his teams, without his permission, and drove it to Fort Smith, and took the baby with them, and returned without the baby, and were drunk when they returned, and that both became angry when he told them to not again take his team, and Thompson went back to Fort Smith that night and brought the baby home with him on the mule which he rode. Appellant further testified that he left home about 8 a. m. for Fort Smith, and, while at the Goldman Hotel in that city, where he was delivering milk, he met his father, who told him the officers were looking for him, and that he was charged with having whipped a baby, and that he then went to the welfare building, where he asked Mrs. McAfee what it all meant. That Mrs. McAfee did not give him any direct answer; neither did she intimate that he had beaten the child. He asked the mother if another doctor was necessary, and told her to bring the baby to his house as soon as it was well.

A Mrs. Harris testified, on behalf of the appellant, that she saw Mrs. McAfee and Thompson as they returned from Fort Smith, and that they were drunk and were singing vulgar songs, and did not then have the baby with them. Mrs. McAfee admitted leaving the baby, and that Thompson had brought it home on a mule, but denied drinking or having been drunk.

Foster Vertrees, a special policeman, testified that he arrested appellant and carried him to jail. The jailer recognized appellant and said, "Well, Jess (the appellant), I see you are in trouble again—it is pretty bad to beat up a baby like that," and appellant answered, "Yes, and the next time I will kill it." Appellant denied having made this statement, and testified that

what he did say to the jailer was, "Yes, it is pretty bad to beat up a baby, and if I knew the man who did it I would kill him."

The trial occurred July 7, and on July 12 Mrs. McAfee made an affidavit in which she repudiated the testimony given by herself at the trial, and this affidavit was filed with the motion for a new trial. On the hearing of this motion this affidavit was read, and Mrs. McAfee was called as a witness and orally examined, her oral testimony being substantially the same as that contained in the affidavit. This testimony was to the effect that appellant had always been kind to witness and to her baby, and that her testimony at the trial that appellant had struck the baby was false, and that she had not fully realized the effect of her testimony when she gave it, and that said testimony was made "in the belief that if I would do so my baby would be returned to me, and that I now desire to tell the whole truth, to the end that an innocent man may not suffer on account of my conduct in said trial in giving testimony against him." That on Tuesday, after the trial on Saturday, she went to appellant's wife and sister and told them she had sworn a lie, and why she had done so, and they talked to appellant, and he said for her to come back to his house, and she did so, and was then living at appellant's house. Witness was told by the doctor and the nurse and a Mr. Strozier that, if she did not swear against appellant, "they would adopt my baby clean out of the relation and that I could never get to see it any more," and that she gave the testimony she did because she was afraid they would take the baby away from her. Witness was in possession of the baby at the time of the trial, and three days after the trial she went back to appellant's house, where she has since lived. The witness did not say the baby had not been whipped, but did testify that appellant had not whipped it.

The court refused to grant the motion for a new trial, hence this appeal.

The case of *Bussey* v. *State,* 69 Ark. 545, discussed the duty of the trial court in granting a new trial, where a witness whose testimony was essential to support a conviction repudiated the testimony on which the conviction was obtained. That was a rape case, and the conviction was based almost entirely on the testimony of the prosecuting witness. It was pointed out that, with the testimony of this witness eliminated or discredited, the result of another trial would be an acquittal, unless additional evidence could be produced; and it was also pointed out that the circumstances under which the retraction was made were such as to raise the belief that the retraction, and not the testimony, was true.

A similar condition existed in the record in the case of *Myers* v. *State,* 111 Ark. 399. This was also a rape case, and it was there said that the jury would not have been warranted in convicting the defendant without the testimony of the prosecuting witness who had repudiated her testimony.

The Bussey case was cited and followed in the case of *Shropshire* v. *State,* 86 Ark. 481. Witness Faucette repudiated testimony which he had given at the trial of the defendant, and explained that he had testified under a misapprehension as to which of two brothers was on trial on a charge of gaming. The testimony of this witness, as the opinion says, "was of gravest moment, and doubtless largely contributed to the conviction of the defendant." The court held that a new trial should have been granted for newly discovered evidence, and, in doing so, said: "If any issue of fact had been made on it, or his affidavit had been in conflict with any of the established facts of the case, or had been made under circumstances throwing suspicion upon it, then the circuit judge should be sustained in disregarding it."

In the case of *Osborne* v. *State,* 96 Ark. 400, Bradley, a witness for the State, recanted by saying that he had answered a certain highly important question adversely to the accused under a misapprehension as to its purport, and that his answer would have been favorable to the accused had he understood it. The court there said the testimony of Bradley was only cumulative, and that the changed testimony would, upon a new trial, be only cumulative, and that such evidence was not sufficient ground for a new trial. The court then quoted from *Bussey* v. *State,* 69 Ark. 545, as follows: "In this latter case it is said: 'And even a confession of perjury on the part of a material witness does not necessarily call for a new trial when, eliminating his evidence, there is still other evidence to support the judgment.'"

The case of *Brown* v. *State,* 143 Ark. 523, was one in which the accused was convicted on the testimony of Simmons, his accomplice. One of the errors assigned was that the testimony of the accomplice was not corroborated; but we held otherwise. Another assignment of error was that a new trial should have been granted because of the recantation of Simmons. We there said: "In the present case Simmons was before the court when he testified at the trial of the defendant, and the court had the opportunity to examine his testimony and demeanor on the witness stand and compare them with the statements made by him in his affidavit after the trial was ended and the defendant had been convicted by the jury. Simmons' testimony was corroborated in several important details, and it cannot be said that the trial court, under the circumstances, abused its discretion in not granting the defendant a new trial because Simmons made a written retraction of his former testimony and swore to the truth of it."

In 16 C. J., § 2715 of the article on Criminal Law, pp. 1188-1190, it is said: "A material error or misstatement in the testimony of a witness for the prosecution may constitute ground for a new trial. Where,

therefore, it appears that, on a new trial, the witness will change his testimony to such an extent as to render probable a different verdict, the new trial will be granted. But recantation by witnesses called on behalf of the prosecution does not necessarily entitle defendant to a new trial. The question whether a new trial shall be granted on this ground depends on all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Especially is this true where the recantation involves a confession of perjury. * * * But where it appears, from competent and satisfactory evidence, that a witness for the prosecution has deliberately perjured himself, and that, without his testimony, defendant would not have been convicted, a new trial will be granted. Usually a new trial will not be granted because of perjury on an immaterial issue, or on a collateral issue, nor generally where the false testimony may be eliminated without depriving the verdict of sufficient evidentiary support.''

The annotator's notes cite many cases in support of the text, among them being our own cases of Bussey, Myers and Shropshire, *supra*.

A very instructive case is the decision of the Court of Appeals of New York in the case of *People* v. *Shilitano*, 218 N. Y. 161, 112 N. E. 733, 1916-F, L. R. A. 1042. It was there said: ''In determining the weight to be given to the statements of these witnesses affirming the guilt of the defendant and recanting their testimony, we must endeavor to discern the motives which actuated them. If, upon examination, it should appear that their testimony upon the trial was given without any motive to falsify and that their statements recanting their testimony were prompted by corrupt or unworthy motives, but little weight should be given to the recanting statements. There is no form of proof

so unreliable as recanting testimony. In the popular mind it is often regarded as of great importance. Those experienced in the administration of the criminal law know well its untrustworthy character.''

Two other instructive cases on the subject are *State v. Blanchard,* 92 N. W. (Minn.) 504 and *Lucia* v. *State,* 59 Atl. (Vt.) 1016.

We have concluded that the court did not err in refusing to grant the motion for a new trial. The court might well have refused to believe the testimony of Mrs. McAfee, offered at the hearing of the motion for a new trial. There appears to have been no reason why the doctor and the nurse and Mr. Strozier would have desired Mrs. McAfee to falsely accuse appellant. On the other hand, the testimony shows that Mrs. McAfee had gone back to the home of appellant, and was living with him as a member of his family, and consequently under his influence, and it was, of course, very much to the interest of appellant to have the witness change her testimony. Moreover, it does not appear that the conviction in this case rested entirely upon the testimony of Mrs. McAfee, nor that a verdict of conviction could not be had without her testimony. It has been pointed out that the witness did not state that the child had not been whipped, but that she only said that appellant had not whipped it, and all the circumstances in the case tend to indicate that, if the baby was whipped, the whipping had been administered by appellant. Indeed, the testimony of Vertrees alone, if accepted by the jury, would sustain the conviction, and, if this be true, the testimony of Mrs. McAfee, while itself sufficient to sustain the conviction, is cumulative of other testimony, which was also sufficient for that purpose.

No error appearing, the judgment is affirmed.